# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **LAWRENCE JOHN SKILLEN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 12-707** |
| | ) | **Chief Judge Gary L. Lancaster** |
| **CAROLYN W. COLVIN,[1] ACTING** | ) | **Magistrate Judge Lisa Pupo Lenihan** |
| **COMMISSIONER OF SOCIAL** | ) | |
| **SECURITY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## REPORT AND RECOMMENDATION

## I.    Introduction

Plaintiff Lawrence John Skillen ("Skillen") brings this action pursuant to 42 U.S.C. §

405(g), seeking judicial review of the final decision of the Commissioner of Social Security

("Commissioner") denying his application for disability insurance benefits under Title II of the

Social Security Act ("Act") [42 U.S.C. §§ 401-433].  The matter is presently before the Court on

cross-motions for summary judgment filed by the parties pursuant to Federal Rule of Civil

Procedure 56.  ECF Nos. 8 & 13.  For the reasons that follow, it is respectfully recommended

that the Commissioner's motion for summary judgment (*ECF No. 13*) be denied, and that

Skillen's motion for summary judgment (*ECF No. 8*) be denied to the extent that it requests an

award of benefits but granted to the extent that it seeks a vacation of the Commissioner's

administrative decision, and a remand for further proceedings.  It is further recommended that

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013, succeeding former Commissioner Michael J. Astrue.  Social Security History-Social Security Commissioners, http://www.ssa.gov/history/commissioners.html (as visited on February 22, 2013).  Consequently, Acting Commissioner Colvin is now the official-capacity defendant in this action.  *Hafer v. Melo*, 502 U.S. 21, 25, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991); FED. R. CIV. P. 25(d).

the Commissioner's decision be vacated, and that the case be remanded for further consideration of Skillen's application for disability insurance benefits.

## II.     <u>Procedural History</u>

Skillen protectively applied for disability insurance benefits on July 29, 2008, alleging that he had become "disabled" on January 29, 2008.  R. at 92, 106.  Pennsylvania's Bureau of Disability Determination denied the application on November 7, 2008.  R. at 66.  Skillen responded on January 2, 2009, by filing a timely request for an administrative hearing.  R. at 10, 71.  On May 11, 2010, a hearing was held in Pittsburgh, Pennsylvania, before Administrative Law Judge ("ALJ") William E. Kenworthy.  R. at 24.  Skillen, who was represented by counsel, appeared and testified at the hearing.  R. at 27-37.  Mary Beth Kopar ("Kopar"), an impartial vocational expert, also testified at the hearing.  R. at 37-40.  In a decision dated May 12, 2010, the ALJ determined that Skillen was not "disabled" within the meaning of the Act.  R. at 7-19.

On June 4, 2010, Skillen sought administrative review of the ALJ's decision by filing a request for review with the Appeals Council.  R. at 6, 147-148.  The Appeals Council denied the request for review on April 23, 2012, thereby making the ALJ's decision the "final decision" of the Commissioner in this case.  R. at 1.  Skillen commenced this action on May 29, 2012, seeking judicial review of the Commissioner's decision.  ECF No. 1.  Skillen and the Commissioner filed motions for summary judgment on September 10, 2012, and November 28, 2012, respectively.  ECF Nos. 8 & 13.  These motions are the subject of this report and recommendation, which is being filed pursuant to 28 U.S.C. § 636(b)(1)(C).

## III.    <u>Standard of Review</u>

This Court's review is plenary with respect to all questions of law.  *Schaudeck v. Commissioner of Social Security Administration*, 181 F.3d 429, 431 (3d Cir. 1999).  With respect

to factual issues, judicial review is limited to determining whether the Commissioner's decision is "supported by substantial evidence." 42 U.S.C. § 405(g); *Adorno v. Shalala*, 40 F.3d 43, 46 (3d Cir. 1994). The Court may not undertake a *de novo* review of the Commissioner's decision or re-weigh the evidence of record. *Monsour Medical Center v. Heckler*, 806 F.2d 1185, 1190-1191 (3d Cir. 1986). Congress has clearly expressed its intention that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565, 108 S.Ct. 2541, 101 L.Ed.2d 490 (1988)(internal quotation marks omitted). As long as the Commissioner's decision is supported by substantial evidence, it cannot be set aside even if this Court "would have decided the factual inquiry differently." *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999). "Overall, the substantial evidence standard is a deferential standard of review." *Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004).

In order to establish a disability under the Act, a claimant must demonstrate a "medically determinable basis for an impairment that prevents him [or her] from engaging in any 'substantial gainful activity' for a statutory twelve-month period." *Stunkard v. Secretary of Health & Human Services*, 841 F.2d 57, 59 (3d Cir. 1988); *Kangas v. Bowen*, 823 F.2d 775, 777 (3d Cir. 1987); 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A claimant is considered to be unable to engage in substantial gainful activity "only if his [or her] physical or mental impairment or impairments are of such severity that he [or she] is not only unable to do his [or her] previous work but cannot, considering his [or her] age, education, and work experience,

engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To support his or her ultimate findings, an administrative law judge must do more than simply state factual conclusions. He or she must make specific findings of fact. *Stewart v. Secretary of Health, Education & Welfare*, 714 F.2d 287, 290 (3d Cir. 1983). The administrative law judge must consider all medical evidence contained in the record and provide adequate explanations for disregarding or rejecting evidence. *Weir on Behalf of Weir v. Heckler*, 734 F.2d 955, 961 (3d Cir. 1984); *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981).

The Social Security Administration ("SSA"), acting pursuant to its legislatively-delegated rulemaking authority, has promulgated a five-step sequential evaluation process for the purpose of determining whether a claimant is "disabled" within the meaning of the Act. The United States Supreme Court recently summarized this process by stating as follows:

> If at any step a finding of disability or non-disability can be made, the SSA will not review the claim further. At the first step, the agency will find non-disability unless the claimant shows that he is not working at a "substantial gainful activity." [20 C.F.R.] §§ 404.1520(b), 416.920(b). At step two, the SSA will find non-disability unless the claimant shows that he has a "severe impairment," defined as "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities." §§ 404.1520(c), 416.920(c). At step three, the agency determines whether the impairment which enabled the claimant to survive step two is on the list of impairments presumed severe enough to render one disabled; if so, the claimant qualifies. §§ 404.1520(d), 416.920(d). If the claimant's impairment is not on the list, the inquiry proceeds to step four, at which the SSA assesses whether the claimant can do his previous work; unless he shows that he cannot, he is determined not to be disabled. If the claimant survives the fourth stage, the fifth, and final, step requires the SSA to consider so-called "vocational factors" (the claimant's age, education, and past work experience), and to determine whether the claimant is capable of performing other jobs existing in significant numbers in the national economy. §§ 404.1520(f), 404.1560(c), 416.920(f), 416.960(c).

*Barnhart v. Thomas*, 540 U.S. 20, 24-25, 124 S.Ct. 376, 157 L.Ed.2d 333 (2003)(footnotes omitted). Factual findings pertaining to all steps of the sequential evaluation process are subject to judicial review under the "substantial evidence" standard. *McCrea v. Commissioner of Social Security*, 370 F.3d 357, 360-361 (3d Cir. 2004).

In an action in which review of an administrative determination is sought, the agency's decision cannot be affirmed on a ground other than that actually relied upon by the agency in making its decision. In *Securities & Exchange Commission v. Chenery Corp.*, 332 U.S. 194, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947), the Supreme Court explained:

> When the case was first here, we emphasized a simple but fundamental rule of administrative law. That rule is to the effect that a reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency. If those grounds are inadequate or improper, the court is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis. To do so would propel the court into the domain which Congress has set aside exclusively for the administrative agency.

*Chenery Corp.*, 332 U.S. at 196. The United States Court of Appeals for the Third Circuit has recognized the applicability of this rule in the Social Security disability context. *Fargnoli v. Massanari*, 247 F.3d 34, 44, n. 7 (3d Cir. 2001). Thus, the Court's review is limited to the four corners of the ALJ's decision. *Cefalu v. Barnhart*, 387 F.Supp.2d 486, 491 (W.D.Pa. 2005).

**IV.    The ALJ's Decision**

In his decision, the ALJ determined that Skillen had not engaged in substantial gainful activity subsequent to his alleged onset date. R. at 12. Skillen was found to be suffering from fibromyalgia, generalized anxiety disorder, and an unspecified depressive disorder. R. at 12-14. These impairments were deemed to be "severe" under the Commissioner's regulations. R. at 12; 20 C.F.R. §§ 404.1520(a)(4)(ii), 404.1520(c). The ALJ concluded that Skillen's impairments did

not meet or medically equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.

R. at 14-15.

In accordance with 20 C.F.R. § 404.1545, the ALJ assessed Skillen's "residual functional capacity"[2] as follows:

> After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except with a sit/stand option at will. The claimant is further limited to the performance of simple, repetitive activities that would not involve dealing with the general public or maintaining close interaction and cooperation with coworkers.

R. at 15. Skillen had "past relevant work"[3] experience as a warehouse worker. R. at 18, 38. Relying on the Dictionary of Occupational Titles ("DOT"), Kopar classified that position as an "unskilled"[4] job at the "medium"[5] level of exertion. R. at 38. She further testified that Skillen had actually performed the job at the "heavy"[6] and "very heavy"[7] levels of exertion. R. at 38. Since Skillen was deemed to be capable of performing only "sedentary" work, it was determined that he could not return to his past relevant work. R. at 18.

---

[2] The term "residual functional capacity" is defined as "that which an individual is still able to do despite the limitations caused by his or her impairments." *Hartranft v. Apfel*, 181 F.3d 358, 359, n. 1 (3d Cir. 1999)(parentheses omitted), citing 20 C.F.R. § 404.1545(a). The same residual functional capacity assessment is used at the fourth and fifth steps of the sequential evaluation process. 20 C.F.R. §§ 404.1545(a)(5)(i)-(ii), 416.945(a)(5)(i)-(ii).

[3] "Past relevant work" is defined as "substantial gainful activity" performed by a claimant within the last fifteen years that lasted long enough for him or her to learn how to do it. 20 C.F.R. §§ 404.1560(b)(1), 416.960(b)(1). The Commissioner has promulgated comprehensive regulations governing the determination as to whether a claimant's work activity constitutes "substantial gainful activity." 20 C.F.R. §§ 404.1571-404.1576, 416.971-416.976.

[4] "Unskilled work is work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time. The job may or may not require considerable strength. For example, [the Commissioner] consider[s] jobs unskilled if the primary work duties are handling, feeding and offbearing (that is, placing or removing materials from machines which are automatic or operated by others), or machine tending, and a person can usually learn to do the job in 30 days, and little specific vocational preparation and judgment are needed. A person does not gain work skills by doing unskilled jobs." 20 C.F.R. §§ 404.1568(a), 416.968(a).

[5] "Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds." 20 C.F.R. §§ 404.1567(c), 416.967(c).

[6] "Heavy work involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds." 20 C.F.R. §§ 404.1567(d), 416.967(d).

[7] "Very heavy work involves lifting objects weighing more than 100 pounds at a time with frequent lifting or carrying of objects weighing 50 pounds or more." 20 C.F.R. §§ 404.1567(e), 416.967(e).

Skillen was born on July 1, 1963, making him forty-four years old on his alleged onset date and forty-six years old on the date of the ALJ's decision. R. at 18, 92. He was classified as a "younger person" under the Commissioner's regulations.[8] 20 C.F.R. § 404.1563(c). He had a high school education and an ability to communicate in English. R. at 18, 110, 117; 20 C.F.R. § 404.1564(b)(4)-(5). Given the applicable residual functional capacity and vocational assessments, the ALJ concluded that Skillen could work as a ticket checker, surveillance system monitor or document preparer. R. at 19. Kopar's testimony established that these jobs existed in the national economy for purposes of 42 U.S.C. § 423(d)(2)(A).[9] R. at 39.

## V. Discussion

Skillen graduated from Plum High School in 1982. R. at 251. Shortly thereafter, he began working as a general warehouseman for a grocery distributor. R. at 112. In that capacity, Skillen was required to lift and carry grocery items weighing up to 120 pounds. R. at 112.

Skillen sustained a neck injury in 2002. A magnetic resonance imaging ("MRI") scan performed on August 29, 2002, revealed that he had a herniated disc. R. at 157. The impairment was surgically corrected by Dr. Joseph C. Maroon on February 11, 2003. R. at 153. In the aftermath of the surgery, Dr. Maroon recommended that Skillen undergo "an eight-week course of physical therapy with job simulation and work hardening activities," since his job required heavy lifting. R. at 153.

Because of his neck impairment, Skillen was unable to work in cold temperatures. R. at 164. In April 2003, his employer transferred him to a different warehouse. R. at 164. After the

---

[8] The regulations recognize that "younger persons" between the ages of forty-five and forty-nine are more limited in their ability to adjust to other work than are persons who have not yet attained the age of forty-five. 20 C.F.R. §§ 404.1563(c), 416.963(c).

[9] At the fifth step of the sequential evaluation process, "the Commissioner bears the burden of proving that, considering the claimant's residual functional capacity, age, education, and past work experience, [he or] she can perform work that exists in significant numbers in the regional or national economy." *Boone v. Barnhart*, 353 F.3d 203, 205 (3d Cir. 2003). This burden is commonly satisfied by means of vocational expert testimony. *Rutherford v. Barnhart*, 399 F.3d 546, 551 (3d Cir. 2005).

7

transfer, Skillen routinely interacted with an individual with whom he did not get along. R. at 164-165. In his view, this individual was attempting to get other employees to "shun" him. R. at 158. Over time, Skillen began to entertain "homicidal thoughts" in relation to the individual. R. at 161. On February 21, 2004, Skillen was voluntarily admitted to Allegheny Valley Hospital's psychiatric unit pursuant to 50 PA. STAT. § 7201.[10] R. at 158. It was determined that he had experienced an acute psychotic episode, and that he was suffering from an affective mood disorder. R. at 161. Skillen was discharged from inpatient treatment on February 27, 2004. R. at 158.

After leaving the hospital, Skillen received outpatient psychiatric treatment from Dr. Charles T. Rumble. R. at 164. Dr. Rumble evaluated Skillen on April 9, 2004. R. at 164. During the evaluation, Skillen expressed doubt as to whether he could return to work. R. at 165. Dr. Rumble observed that Skillen had "difficulties working with large groups of people." R. at 165. Skillen ultimately returned to work so that he could retire with a full pension four years later. R. at 165.

During the spring of 2007, Skillen began to experience pain in his elbows. R. at 233. The pain eventually spread to the rest of his body. R. at 233. On January 3, 2008, Skillen returned to Dr. Rumble's office for an evaluation. R. at 233. Dr. Rumble expressed concern that Skillen's physical symptoms were exacerbating his mental condition. R. at 233. Skillen indicated that he was experiencing "no particular stresses" aside from his physical ailments, and that he feared the financial consequences of losing his job. R. at 233, 235.

Skillen's treating rheumatologist, Dr. Deborah Co, reported on January 11, 2008, that Skillen had "missed a few days of work due to pain." R. at 286. She observed that his job

---

[10] The record indicates that Skillen received a three-week suspension in March 2003 for threats directed at his co-worker. R. at 165. The suspension was apparently triggered by warnings conveyed to the co-worker by hospital officials. R. at 165.

"involve[d] dumping garbage, lifting heavy boxes and sweeping for long periods of time." R. at 286. Dr. Co completed a form certifying that Skillen was in need of medical leave.[11] R. at 286. After a brief period of intermittent leave, Skillen stopped working on January 29, 2008. R. at 27-28. He formally resigned from his position in June 2008.[12] R. at 27-28, 282. One month later, Skillen submitted his application for disability insurance benefits. R. at 92, 106.

Dr. Nghia Van Tran, a non-examining medical consultant, opined on October 1, 2008, that Skillen was physically capable of performing a range of "light"[13] work activities that did not involve moderate exposure to extremely cold temperatures. R. at 242-248. On October 23, 2008, Dr. Charles Kennedy performed a consultative psychological evaluation of Skillen in connection with his application for benefits. R. at 249-256. Based on the findings of his evaluation, Dr. Kennedy reported that Skillen had "marked" limitations in his abilities to interact appropriately with members of the general public and respond appropriately to work pressures in a usual work setting. R. at 255. Skillen was found to have "moderate" limitations in his abilities to understand, remember and carry out detailed instructions, interact appropriately with supervisors and co-workers, and respond appropriately to changes in a routine work setting. R. at 255. His abilities to understand, remember and carry out short, simple instructions and make judgments concerning simple work-related decisions were deemed to be only "slightly" limited. R. at 255. Dr. Kennedy remarked that outpatient counseling could potentially improve Skillen's condition. R. at 253.

---

[11] An employer may require an employee seeking medical leave to produce a "certification issued by [his or her] health care provider." 29 U.S.C. § 2613(a).

[12] Skillen's resignation apparently caused him to lose his health insurance. R. at 250, 282.

[13] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, [a claimant] must have the ability to do substantially all of these activities." 20 C.F.R. §§ 404.1567(b), 416.967(b).

Dr. John Rohar, a non-examining psychological consultant, stated on November 5, 2008, that Skillen was "able to meet the basic mental demands of competitive work on a sustained basis despite the limitations resulting from his impairments." R. at 259. In the narrative portion of his consultative report, Dr. Rohar stated as follows:

> The claimant can perform simple, routine, repetitive work in a stable environment. He can understand, retain, and follow simple job instructions, i.e., perform one and two step tasks. He can make simple decisions. He is capable of asking simple questions and accepting instruction. Moreover, he can function in production oriented jobs requiring little independent decision making.

R. at 259. Dr. Rohar viewed Dr. Kennedy's examination report as "an overestimate of the severity of [Skillen's] functional restrictions." R. at 259.

Renee Arduini ("Arduini"), a mental health therapist working under Dr. Rumble's supervision, detailed Skillen's mental limitations in an assessment dated December 19, 2008. R. at 275-277. She reported that Skillen's abilities to deal with work-related stress, function independently and maintain attention and concentration were "poor." R. at 275. Skillen's abilities to follow work rules, relate to co-workers, deal with members of the general public, use judgment, interact with supervisors, implement job instructions, behave in an emotionally stable manner, relate predictably in social situations, and demonstrate reliability were described by Arduini as "fair." R. at 275-276. Arduini indicated that Skillen had a "good" ability to maintain his personal appearance. R. at 276. Dr. Rumble and Arduini both opined that Skillen could not complete a normal workday or workweek. R. at 277. In a handwritten notation, however, Dr. Rumble pointed out that he had never had an opportunity to observe Skillen's behavior in a work setting. R. at 275.

After losing his health insurance, Skillen was no longer able to seek treatment from Dr. Co. R. at 324. Skillen's primary care physician, Dr. Darrell W. Petz, referred him to Dr. Burton

H. Pollock for further rheumatological care.  R. at 324.  On January 7, 2009, Skillen told Dr.

Pollock that he had "quit working out" because of the pain in his elbows.  R. at 325.

Nonetheless, Skillen stated that he was still able to lift "light weights."  R. at 325.  At the

hearing, Skillen testified that the weights mentioned in Dr. Pollock's treatment note weighed

14.5 pounds.  R. at 33.

Skillen saw Dr. Pollock again on January 28, 2009.  R. at 329.  On that occasion, Dr.

Pollock observed that Skillen was "severely depressed" because of physical symptoms

attributable to fibromyalgia.  R. at 329.  It was further noted that Skillen's despression was

aggravating his fibromyalgia.  R. at 330.  In a letter to Dr. Petz describing Skillen's course of

treatment, Dr. Pollock stated:

> I tried to explain to him that he did not have any underlying connective tissue
> disease, and that all of his symptoms were from the fibromyalgia.  When
> somebody with fibromyalgia gets more depressed, they cannot handle the pain
> and it becomes that much worse, and that is what he is going through now.  I told
> him to try to talk about [sic] Dr. Rumble about getting disability on the basis of
> his depression because he will not get it on the basis of fibromyalgia, and he does
> not have any underlying serious connective tissue disease.

R. at 336.  Dr. Pollock further explained to Dr. Petz that Skillen should "gradually increase his

activities and do a little more exercise."  R. at 336.

In a medical statement completed on January 14, 2009, Dr. Petz reported that Skillen

could "never" lift or carry objects weighing ten pounds or more, and that he could lift or carry

lighter objects on only an occasional basis.  R. at 279.  Dr. Petz also indicated that Skillen could

not stand or walk for two hours, or sit for six hours, during the course of an eight-hour workday.

R. at 279.  Skillen was deemed to be precluded from climbing or crawling and restricted to only

occasional balancing, stooping, kneeling or crouching.  R. at 280.  His reaching, handling,

fingering and seeing abilities were found to be limited.  R. at 280.  Characterizing Skillen's pain

as "severe," Dr. Petz responded in the affirmative when asked whether Skillen was suffering from chronic pain syndrome.  R. at 281.

Skillen visited Dr. Avinash Aggarwal on February 12, 2009, complaining of intermittent headaches.  R. at 338.  A prescription for Neurontin was provided to alleviate his pain.  R. at 338.  During a follow-up examination performed on March 10, 2009, Skillen told Dr. Aggarwal that he was "hurting all over."  R. at 322.  On April 23, 2009, Dr. David G. Wright performed a neurological examination of Skillen to determine whether he had multiple sclerosis.  R. at 318-320.  The examination yielded negative results.  R. at 319.  Dr. Wright suggested that Skillen's pain was attributable to a "rheumatologic condition" like fibromyalgia.  R. at 320.  No additional neurological testing was ordered.  R. at 320.

The record contains statements submitted by Skillen's father, wife, and two of his friends.  R. at 142-145.  Skillen's father, Russell Skillen, declared that his son typically experienced "severe headaches" and difficulties with walking and lifting.  R. at 142.  Skillen's wife, Deborah Skillen, stated that her husband's pain frequently precluded him from sleeping, leaving him lethargic for extended periods of time.  R. at 144.  Two of Skillen's friends supplied statements describing the impact that his impairments had on his day-to-day activities.  R. at 143, 145.  Margaret Hunkele asserted that Skillen was "unable to concentrate" because of pain and sleeplessness.  R. at 143.  Mary B. Cannon described instances in which Skillen had worn sunglasses inside of his house due to the intensity of his headaches.  R. at 145.

At the hearing, Skillen testified that prolonged sitting would cause him to experience stiffness.  R. at 37.  He also complained of headaches lasting anywhere from a few hours to two weeks.  R. at 37.  Skillen remarked that he "constantly" experienced headaches during the winter months.  R. at 37.  In response to a question posed by Skillen's counsel, Kopar testified that no

work existed in the national economy for an individual who would be "off task" for more than 20% of a standard workday due to physical and mental impairments.[14]  R. at 39.

The ALJ accorded "no weight" to Dr. Petz's assessment of Skillen's physical limitations, finding it to be lacking in evidentiary support.  R. at 17.  Specifically, the ALJ noted that Skillen had admitted to lifting 14.5-pound weights even though Dr. Petz had opined that he could "never" lift or carry objects weighing ten pounds or more.  R. at 16-17, 33, 279.  In addition, the ALJ relied on the fact that Dr. Pollock had not found Skillen's fibromyalgia to be disabling.  R. at 17, 336.  Although Dr. Tran had found Skillen to be physically capable of performing "light" work, the ALJ predicted that "sustained activity at the light exertional level would probably exacerbate [Skillen's] pain symptoms."  R. at 17, 243.  Consequently, it was determined that Skillen could perform only "sedentary" work permitting him to sit or stand at will.  R. at 15, 17.

The assessment completed by Dr. Rumble and Arduini was rejected on the premise that Dr. Rumble had only examined Skillen on one occasion.  R. at 17.  The examination referenced by the ALJ was performed on January 3, 2008, when Skillen was still working.  R. at 17, 233-235.  The ALJ apparently overlooked the fact that Dr. Rumble had previously treated Skillen in the immediate aftermath of his 2004 psychiatric hospitalization, and that Skillen had been evaluated by Dr. Rumble seven times in 2008.  R. at 164-167, 233-241.

The "marked" limitations identified by Dr. Kennedy were accommodated by the portion of the residual functional capacity assessment restricting Skillen to "the performance of simple, repetitive activities that would not involve dealing with the general public or maintaining close

---

[14] The inquiry required under the Social Security Act does not account for any "reasonable accommodations" mandated by Title I of the Americans with Disabilities Act of 1990 [42 U.S.C. §§ 12111-12117].  *Cleveland v. Policy Management Systems Corp.*, 526 U.S. 795, 803, 119 S.Ct. 1597, 143 L.Ed.2d 966 (1999); *Poulos v. Commissioner of Social Security*, 474 F.3d 88, 95 (3d Cir. 2007).

interaction and cooperation with coworkers."  R. at 15.  Referring to Dr. Kennedy's examination

findings, the ALJ explained:

> The consultative examiner, Dr. Kennedy, who also evaluated the claimant on one
> occasion, checked that the claimant would have marked impairment of the ability
> to interact with the public or to respond to work pressures.  (Ex. 13F)  The
> standard form definition of the term "marked impairment" is that performance
> involving such ability is seriously limited but not precluded.  In any event, the
> claimant's mental limitations to the extent supported in this record are
> appropriately accommodated in the statement of residual functional capacity.  The
> residual functional capacity rules out dealing with the general public, and a
> limitation to simple and repetitive activities limits the work stresses to which he
> would be subjected in the routine course of events.  He would not be required to
> maintain attention and concentration upon detailed tasks.

R. at 17-18.  The ALJ concluded his analysis by affording "[s]ubstantial weight" to Dr. Rohar's

assessment.[15]  R. at 18.

Skillen assails the ALJ for failing to accord significant weight to the opinions expressed

by his treating healthcare providers.  ECF No. 9 at 13-16, 27-30.  Contrary to Skillen's belief, the

opinions of disability expressed by Dr. Petz and Dr. Rumble did not inevitably control the issue

of his residual functional capacity.  *Brown v. Astrue*, 649 F.3d 193, 196, n. 1 (3d Cir. 2011).  The

assessments provided by Dr. Tran, Dr. Kennedy and Dr. Rohar also merited "significant

consideration."  *Chandler v. Commissioner of Social Security*, 667 F.3d 356, 361 (3d Cir. 2011).

Every medical opinion, regardless of its source, must be afforded some consideration.  *Williams*

*v. Sullivan*, 970 F.2d 1178, 1185, n. 5 (3d Cir. 1992).  When a conflict in the evidence exists, the

Commissioner is ordinarily "free to choose the medical opinion of one doctor over that of

another."  *Diaz v. Commissioner of Social Security*, 577 F.3d 500, 505 (3d Cir. 2009).  A lack of

objective evidence supporting a treating physician's assessment can be a significant factor

---

[15] Skillen contends that the ALJ erred in failing to specify the "weight" given to Dr. Kennedy's examination report.
ECF No. 9 at 24-25.  That argument is a red herring.  The ALJ carefully explained that the "marked" limitations
identified by Dr. Kennedy had been accommodated by the residual functional capacity assessment.  R. at 17-18.

weighing against the adoption of that assessment.  *Newhouse v. Heckler*, 753 F.2d 283, 286 (3d Cir. 1985).  In certain instances, the opinion of a treating physician may be so lacking in probative value that it cannot overcome competing opinions provided by non-examining consultants.  *Jones v. Sullivan*, 954 F.2d 125, 129 (3d Cir. 1991).  The probative force of any medical opinion must be judged in relation to the evidentiary record as a whole.  *Miller v. Commissioner of Social Security*, 172 F.3d 303, 304 (3d Cir. 1999).

On the basis of the existing record, the ALJ had an adequate basis for rejecting Dr. Petz's assessment.  Skillen testified that he had lifted 14.5-pound weights during the relevant period of time.  R. at 33.  That testimony directly contradicted Dr. Petz's assertion that Skillen could "never" lift or carry objects weighing ten pounds or more.  R. at 279.  In his letter to Dr. Petz, Dr. Pollock specifically stated that Skillen could not obtain disability insurance benefits on the basis of his fibromyalgia, and that no "underlying serious connective tissue disease" was present.[16]  R. at 336.  The ALJ made reference to Dr. Pollock's letter in the portion of his decision rejecting Dr. Petz's opinion.  R. at 17.  Dr. Tran indicated that Skillen was physically capable of performing "light" work.  R. at 243.  Although the ALJ expressed the view that "sustained activity at the light exertional level would probably exacerbate [Skillen's] pain symptoms," Dr. Tran's opinion nevertheless refuted Dr. Petz's contention that Skillen was incapable of performing "sedentary" work.  R. at 17, 243, 279.

While the ALJ was not required to adopt Dr. Petz's opinion, he was required to account for all of Skillen's credibly established limitations.  *Rutherford v. Barnhart*, 399 F.3d 546, 554

---

[16] In a treatment noted dated January 28, 2009, Dr. Pollock stated that fibromyalgia was "not a recognized cause for disability."  R. at 330.  It is not clear whether he erroneously believed that fibromyalgia could never entitle a claimant to benefits, or whether he simply thought that Skillen's fibromyalgia was lacking the severity necessary to support a finding of disability.  Any impairment resulting in disabling pain can justify an award of benefits.  *Ferguson v. Schweiker*, 765 F.2d 31, 37 (3d Cir. 1985).  Nonetheless, the ALJ reasonably interpreted Dr. Pollock's statements to mean that Skillen's physical impairments did not prevent him from performing the duties of a full-time job.  R. at 17.

(3d Cir. 2005).  It is undisputed that, after his 2003 neck surgery, Skillen was no longer able to work in cold temperatures.  R. at 164.  Indeed, his transfer from a "cold warehouse" to a different location is precisely what precipitated his encounter with a hostile co-worker and the concomitant deterioration of his mental condition.  R. at 158, 164.  Based on his review of the documentary evidence, Dr. Tran concluded that Skillen was incapable of tolerating even moderate exposure to extremely cold temperatures.  R. at 245.  At the hearing, Skillen testified that he "constantly" endured headaches during the winter months.  R. at 37.  Despite the uncontradicted evidence suggesting that Skillen needed to limit his exposure to cold temperatures, the ALJ's residual functional capacity assessment (and corresponding hypothetical question to Kopar) failed to account for that limitation.  R. at 15, 38-39.

An administrative law judge "may not make speculative inferences from medical reports" in order to deny a claimant's application for benefits.  *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999).  Competent medical evidence cannot be rejected solely on the basis of an administrative law judge's "own credibility judgments, speculation or lay opinion."  *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000).  In this vein, a decision denying a claimant's application for benefits is subject to challenge when it is based on a mischaracterization of the relevant evidence.  *Brownawell v. Commissioner of Social Security*, 554 F.3d 352, 357 (3d Cir. 2008).

In the portion of his decision rejecting the assessment provided by Dr. Rumble and Arduini, the ALJ incorrectly stated that Dr. Rumble had evaluated Skillen only once.  R. at 17.  Although there was a lengthy gap in Skillen's treatment with Dr. Rumble, the record conclusively establishes that the treatment relationship in question dated back to April 2004.  R. at 164-167.  The duration of that relationship was a factor that should have weighed in favor of crediting Dr. Rumble's opinion.  20 C.F.R. § 404.1527(c)(2)(i).  Furthermore, the documentary

record confirms that Dr. Rumble evaluated Skillen seven times in 2008. R. at 233-241. Dr. Rumble and Arduini completed their assessment on December 19, 2008. R. at 275-277. The ALJ mistakenly viewed the assessment as having been based solely on the evaluation performed on January 3, 2008. R. at 17, 233-235. He apparently overlooked the six intervening visits between that evaluation and the completion of the assessment. R. at 236-241. In any event, the ALJ plainly failed to recognize that Dr. Rumble was in a position to "provide a detailed, longitudinal picture" of Skillen's mental condition. 20 C.F.R. § 404.1527(c)(2). Even if Dr. Rumble's opinion was not entitled to "controlling weight," the ALJ was required to properly consider it in accordance with the Commissioner's regulations. *Gonzalez v. Astrue*, 537 F.Supp.2d 644, 660 (D.Del. 2008).

During the relevant period of time, Dr. Rumble repeatedly assigned Skillen a Global Assessment of Functioning ("GAF") score of forty-five.[17] R. at 235, 238-241. The ALJ did not discuss these GAF scores in his decision. Skillen maintains that this omission justifies a remand for further consideration of his claim.[18] ECF No. 9 at 16-19. The Commissioner argues that Skillen's GAF scores were not probative of his work-related abilities and limitations, thereby making it unnecessary for the ALJ to discuss them. ECF No. 14 at 25-26.

---

[17] "The Global Assessment of Functioning ('GAF') scale, designed by the American Psychiatric Association, ranges from zero to one hundred and assesses a person's [level of] psychological, social and occupational function[ing]." *Taliaferro v. Astrue*, 788 F.Supp.2d 412, 414, n. 2 (W.D.Pa. 2011). A GAF score falling between forty-one and fifty is *sometimes* indicative of an individual exhibiting "serious impairment in social, occupational, or school functioning." American Psychiatric Association: *Diagnostic and Statistical Manual of Mental Disorders*, ("DSM-IV-TR")(4th ed. 2000), at 34. An individual with a GAF score in this range *may* be "unable to keep a job." *Id.*

[18] Skillen was given a GAF rating of "20 to 25" during his 2004 hospitalization. R. at 161. That score, however, was too far removed from the relevant period of time to be of probative value. *Johnson v. Commissioner of Social Security*, 529 F.3d 198, 203-205 (3d Cir. 2008)(explaining that the Commissioner is only required to discuss evidence that is both pertinent and probative). Moreover, Skillen's mental condition during his six-day hospitalization did not last long enough to satisfy the Act's twelve-month durational requirement. *Barnhart v. Walton*, 535 U.S. 212, 214-222, 122 S.Ct. 1265, 152 L.Ed.2d 330 (2002). Since Skillen worked for four years after leaving the hospital, the record conclusively establishes that his 2004 condition was not disabling under the Act. *Id.* at 222-225.

Although GAF ratings may be "useful in tracking a patient's progress in global terms," they do not necessarily correlate with his or her ability to perform specific work-related tasks. *Chanbunmy v. Astrue*, 560 F.Supp.2d 371, 383 (E.D.Pa. 2008). A GAF score of forty-five cannot be equated with a statutory disability. *Davis v. Astrue*, 830 F.Supp.2d 32, 46 (W.D.Pa. 2011). The omission of a GAF score from an administrative decision does not warrant a remand if the administrative law judge adequately discusses the alleged or established functional limitations reflected by that score. *Bracciodieta-Nelson v. Commissioner of Social Security*, 782 F.Supp.2d 152, 165 (W.D.Pa. 2011). In this case, however, the ALJ completely overlooked the evaluations at which some of the GAF ratings were assigned. R. at 238-241. This glaring oversight appears to have infected the ALJ's consideration of Dr. Rumble's assessment as a whole. R. at 17. Accordingly, the ALJ's decision cannot be affirmed.

In his treatment notes and subsequent letter to Dr. Petz, Dr. Pollock suggested that Skillen's fibromyalgia and depression were linked together in some way. R. at 330, 336. Where a claimant suffers from both physical and mental impairments, the need for an accurate residual functional capacity assessment is particularly acute. *Burnam v. Schweiker*, 682 F.2d 456, 458 (3d Cir. 1982). Given the uncertainties surrounding the relationship between Skillen's fibromyalgia and depression, the proper remedy in this case is a remand for further consideration of his application for benefits. *Diaz*, 577 F.3d at 504-506. Skillen should be afforded "an opportunity to be heard" on remand. *Thomas v. Commissioner of Social Security Administration*, 625 F.3d 798, 799-800 (3d Cir. 2010).

**VI.** **Conclusion**

It is respectfully recommended that the Commissioner's motion for summary judgment (*ECF No. 13*) be denied, and that Skillen's motion for summary judgment (*ECF No. 8*) be denied

to the extent that it requests an award of benefits but granted to the extent that it seeks a vacation of the Commissioner's administrative decision, and a remand for further proceedings. It is further recommended that the Commissioner's "final decision" be vacated, and that the case be remanded to the SSA for further consideration of Skillen's claim. 42 U.S.C. § 405(g). In accordance with 28 U.S.C. § 636(b)(1), the parties have fourteen days to file written objections to this report and recommendation. A party's failure to file written objections will seriously impair his or her ability to challenge this Court's legal conclusions on appeal. *Brightwell v. Lehman*, 637 F.3d 187, 193, n. 7 (3d Cir. 2011).


Dated: February 26, 2013

LISA PUPO LENIHAN
United States Magistrate Judge


cc:     All counsel of record